

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-09-041-CV

IN THE INTEREST OF K.W., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant S.H., the alleged biological father of K.W., appeals the trial court's order terminating the parent-child relationship between himself and K.W. In four issues, Appellant challenges the legal and factual sufficiency of the evidence regarding the court's findings of fact. We will affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

K.W. was born to J.W. ("Mother") on March 5, 2008. Mother and K.W. tested positive for methamphetamine on the day of birth. On March 10, 2008, the Texas Department of Family and Protective Services ("the Department") filed a Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent/Child Relationship.[2] The trial court held a show cause hearing on March 14, 2008, and a two-day final hearing on the Department's petition beginning January 26, 2009.[3]

The trial court terminated Appellant's and Mother's parental rights on February 6, 2009. Because Mother has not appealed, we summarize only those facts pertinent to the termination of Appellant's parental rights.

### A. Appellant's Criminal History

Appellant served approximately thirty-six months in jail over the last decade on eight convictions. At the age of 22, Appellant received two years' deferred adjudication for possession of methamphetamine, less than one gram.

---

[2] ... The Department interviewed Mother on Friday, March 7, 2008, and filed the petition the following Monday.

[3] ... Mother did not attend the final hearing. Her counsel announced "not ready" to proceed and requested a continuance because she claimed she did not receive proper notice of the January 26, 2009 hearing. The trial court denied Mother's request.

Appellant then served ninety days in jail after the court revoked his probation on January 18, 2000, for assaulting his daughter's mother.[4]

On December 19, 2001, Appellant pleaded guilty to two counts of possession of methamphetamine and received two concurrent two-year jail sentences. In November 2003, Appellant received a sentence of one year imprisonment for forgery. In July 2007, a court sentenced Appellant to 180 days' imprisonment for possession of methamphetamine.[5] On September 25, 2008, a court sentenced Appellant to four years' imprisonment for unlawfully possessing a firearm,[6] and placed him on deferred adjudication probation for ten years with a $1,000 fine for the separate offense of intent to deliver between one and four grams of methamphetamine.

B. Appellant's Relationship with Mother and His Claim of Paternity

Appellant and Mother were friends who used methamphetamine together. Appellant testified he learned he might be K.W.'s father when Mother visited

---

[4] ... Appellant testified his daughter was born prior to the assault in 2001. But at the January 2009 parental termination hearing, Appellant was unable to recall his daughter's birthday, believed she was eight years of age, and stated he had not seen her in several years.

[5] ... Appellant served this 180-day sentence from July 23, 2007, through August 2, 2007, and from November 7, 2007, through April 25, 2008. Thus, Appellant was incarcerated at the time of K.W.'s birth.

[6] ... Appellant began serving a four-year sentence for the offense of unlawful possession of a firearm on September 2, 2008.

him in jail and revealed she was two months' pregnant. Two days after K.W.'s birth, Mother told a Child Protective Services (CPS) investigator that Appellant may be the father and provided no indication of other potential fathers.

Appellant does not dispute that he did not file an admission of paternity or a counterclaim for paternity in this case. However, Appellant did file a timely answer generally denying the Department's claims. At trial, Appellant acknowledged he is K.W.'s biological father and testified, "Once I had seen the pictures of [K.W.], I thought that we were—that it was very little chance that he was not mine, but I don't have a problem with taking a DNA test."

C. The Department's Initial Actions

The Department received notice on March 6, 2008, that Mother tested positive for methamphetamine at K.W.'s birth. The next day, CPS Investigator Teresa Shipley visited Mother in the hospital. During Shipley's visit, Mother was uncooperative, claiming that her attorney advised her "not to answer any more questions nor sign any more papers" and denying drug use or having any history with CPS.[7] Shipley did learn that Mother's mother had recently moved to Louisiana and that Mother was living with some of Appellant's family, but

---

[7] Mother gave birth to a child who tested positive for drugs in October 2005, resulting in the removal of Mother's two children and voluntary placement of the children with Mother's mother.

4

Mother did not provide a local address. In response to Shipley's inquiries, Mother provided Appellant's name as K.W.'s potential father, stated Appellant was in the Tarrant County jail, and provided the names of Appellant's mother and sister. Mother did not provide any contact information for these individuals, nor did she identify other family members as potential placements for K.W.

Shipley testified she was concerned for K.W.'s safety if K.W. was placed with Mother upon being released from the hospital. She therefore obtained a court order for K.W.'s emergency removal from Mother. The state took custody of K.W. on March 7, 2008, and placed K.W. with a foster home.

Regarding the Department's communication with Appellant during this time period, Shipley testified she was uncertain whether she sent him a letter and could not recall if she had gone to the jail to speak with him. Shipley agreed, however, that if potential placement options are identified by the father, they are considered by CPS. Shipley also admitted she did not meet with Appellant prior to her signing the affidavit requesting emergency relief. Shipley explained that Mother never definitively said that Appellant was the father, nor did Mother identify any of Appellant's family members as potential placements for K.W.

D. The Effort to Place K.W. with Family

Shortly after the March 14, 2008 show cause hearing, CPS conducted a home study on Judy Golden, a friend of Appellant's mother. The home study tentatively recommended placing K.W. with Golden, but Golden declined to submit to a drug test. Mother identified no other potential placements for K.W.

Appellant's sister accompanied Mother on her first visit with K.W. under Mother's service plan. During the visit, CPS caseworker Whitney Lagadinos spoke with Appellant's sister and obtained her contact information, but Lagadinos determined Appellant's sister was not a possible placement for K.W. because she was living with "somebody who had a questionable criminal history."

At Appellant's request,[8] Lagadinos contacted Appellant's grandmother, who declined a home study because of her age and health problems.

E. Appellant's Service Plan and Efforts to Keep K.W.

After being released from jail on bond in late April 2008, Appellant visited with K.W. on several occasions. He met Lagadinos on May 6, 2008, while attending a parent-child visit with Mother. During this meeting, Lagadinos reviewed Appellant's service plan with him. It included a drug and alcohol

---

[8] Appellant placed this request on May 6, 2008, the first time he met K.W. and Lagadinos.

assessment, a psychological evaluation, parenting classes, drug screenings, and stable housing and employment evaluations. Lagadinos testified Appellant indicated he understood the service plan's requirements and was willing to complete them—although he acknowledged that his ability to do so would require completion before he was sentenced and returned to jail. Appellant failed to complete any of the services in his plan before he returned to jail in September 2008.

Appellant supported placement of K.W. with Mother. In early January 2009, however, he learned from his family that Mother could not be located and had stopped visiting K.W.[9] Appellant then asked his sister to "take steps to [do] whatever it took to get [his] baby." Appellant's sister knew her former live-in boyfriend's criminal history—a child endangerment charge involving driving and drugs—previously disqualified her from being a candidate for placement.[10] Approximately one week before the January 26, 2009 termination hearing, Appellant's sister rented her own apartment and notified CPS that she would like to be reconsidered for placement.

---

[9] ... Mother tested positive for methamphetamine in December 2008 and broke off contact with CPS at that time.

[10] ... At the hearing, Appellant's sister testified that after breaking up with her boyfriend in August 2008, she temporarily moved in with her parents. She also testified that the former boyfriend continues to visit their daughter once or twice a week for a couple of hours each time.

F. The Trial Court's Decision

Following a bench trial, the trial court found (1) that Appellant failed to assert paternity in accordance with family code section 161.002; (2) that Appellant endangered K.W. by (a) knowingly placing or knowingly allowing K.W. to remain in conditions that endangered his well-being, and (b) engaging in conduct or knowingly placing K.W. with persons who engaged in conduct that endangered his well-being; (3) that Appellant constructively abandoned K.W.; and (4) that termination of the parent-child relationship was in K.W.'s best interest. Tex. Fam. Code Ann. § 161.002(b)(1) (Vernon 2008).

## III. Discussion

A. Appellant Admitted Paternity

In his first issue, Appellant argues that the trial court erred by finding that he failed to admit paternity under chapter 160 of the Texas Family Code. We agree.[11]

Subsection 161.002(b)(1) of the family code allows the Department to summarily terminate the rights of an alleged biological father who does not assert his paternity. Tex. Fam. Code Ann. § 161.002(b)(1); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex.

---

[11] ... In its brief, the Department acknowledges, "The trial court's paternity finding cannot be defended under controlling precedent."

8

App.—Austin 2000, no pet.). Section 161.002(b) provides that "[t]he rights of the alleged father may be terminated if [ ] . . . after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under chapter 160." Tex. Fam. Code Ann. § 161.002(b). However, if the alleged father files an admission of paternity or otherwise claims paternity, the alleged father prevents summary termination of his rights, and the Department must instead meet the high burden of proof found in section 161.001. Tex. Fam. Code Ann. § 161.002(a); *Phillips*, 25 S.W.3d at 357.

The trial court's judgment recites that Appellant is the alleged biological father of K.W. The judgment also declares Appellant's alleged parental rights are terminated under section 161.002(b)(1) because, after being served with citation, he "did not respond [to this termination suit] by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code . . . ."

This court has held that there are no formalities that must be observed for an admission of paternity to be effective. *See, e.g.*, *In re V.S.R.K.*, No. 02-08-047-CV, 2009 WL 736751, at *4 (Tex. App.—Fort Worth Mar. 19, 2009, no pet.); *In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied) (holding letters written by the alleged father to the trial court stating he

9

was the child's father were sufficient, alone, to be an admission of paternity); *see also Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 105 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that alleged father's appearance at termination hearing and admission that he was the child's father were sufficient to prevent the summary termination of his parental rights); *Estes v. Dallas County Child Welfare Unit of Tex. Dep't of Human Servs.*, 773 S.W.2d 800, 802 (Tex. App.—Dallas 1989, writ denied) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (holding that a pro se answer filed by alleged father, in which he claims to be an indigent parent and requests the appointment of an attorney, constitutes an admission of paternity)).

In this case, Appellant did not file a counterclaim for paternity or for voluntary paternity under chapter 160 of the family code. However, he filed a timely answer, claimed to be an indigent parent, requested the appointment of counsel, and made numerous admissions of paternity during trial:

Attorney: At any point in time, have you questioned whether or not [K.W.] was your child?

Appellant: No.

. . . .

Attorney: And are you acknowledging that you're [K.W.'s] father?

Appellant: Yes, I am.

10

Because we are required to strictly construe involuntary termination statutes in favor of the parent, we conclude that Appellant admitted his paternity of K.W. for purposes of section 161.002(b)(1) by timely filing a general denial and admitting paternity during his trial testimony. *See In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.); *see also Holick*, 685 S.W.2d at 18, 20–21. Therefore, the Department was not entitled to summary termination of Appellant's parental rights under family code section 161.002(b)(1), and we will review the trial court's findings supporting termination under section 161.001.

B. Grounds for Termination

1. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all "legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit." Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2009); *Holick*, 685 S.W.2d at 20 (Tex. 1985). Accordingly, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Id.* at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish at least one ground listed under subsection (1) of the statute and prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* §

101.007 (Vernon 2006). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification of parental rights).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's

13

province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency in parental termination cases, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d at 108.

2. Legally and Factually Sufficient Evidence of Endangerment

In his second issue, Appellant argues the evidence is legally and factually insufficient to support the trial court's endangering-conduct and endangering-environment findings. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E). Endangerment, as that term is used in the statute, means to expose to loss or

14

injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Based on this definition and the record before us, we conclude that the evidence is legally and factually sufficient to support the trial court's endangerment findings. *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (E).

To prove endangerment under subsection (D), the Department had to prove that Appellant (1) knowingly (2) placed or allowed K.W. to remain (3) in conditions or surroundings that endangered his physical or emotional well-being. *See id.* § 161.001(1)(D). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of K.W.'s physical or emotional well-being was the direct result of Appellant's conduct, including acts, omissions, or failures to act. *Id.* § 161.001(1)(E); *In re J.T.G.*, 121 S.W.3d at 125. Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.T.G.*, 121 S.W.3d at 125; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred

from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination based on endangerment is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

A factfinder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39, and *In re C.H.*, 89 S.W.3d at 26. A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *In re R.W.*, 129 S.W.3d at 739 (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)); *In re J.T.G.*, 121 S.W.3d at 125. Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *In re J.T.G.*, 121 S.W.3d at 133.

16

While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34; *In re R.W.*, 129 S.W.3d at 743–44.

The record contains substantial evidence of environmental endangerment and course of conduct endangerment to K.W.'s physical or emotional well-being. Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of that evidence. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see In re J.T.G.*, 121 S.W.3d at 126.

Appellant contends there is no evidence showing that Appellant knowingly placed or allowed K.W. to remain in conditions or surroundings that endangered K.W.'s physical or emotional well-being. However, the record demonstrates Appellant has a long history of illegal drug use—and admitted to using methamphetamine with Mother.

Four of Appellant's eight criminal convictions relate to possession of methamphetamine and Appellant is on deferred adjudication through September 2018 for a fifth drug offense—possession with intent to deliver methamphetamine. Over the last decade, Appellant served a total of thirty-six months in the Tarrant County jail and returned to the State's custody on

17

September 2, 2008, to serve a four-year term for unlawful possession of a firearm.[12]

Appellant testified that he and Mother were friends, they had a relationship before Appellant's brief incarceration in July 2007, and they used methamphetamine together—possibly while Mother was pregnant with K.W.:

> Q: Have you ever used methamphetamine with [Mother]?
>
> A: Yes, ma'am.
>
> Q: When, prior to your incarceration, when had been the last time you had used methamphetamine with [Mother]?
>
> A: I can't recall.
>
> Q: Would it have been during the time period between August 2007 and when you went back into jail in November [2007]?[13]
>
> A: I guess. I can't recall. It was a long time ago.

Appellant knew two months into Mother's pregnancy that she was pregnant with his child.[14] Appellant testified at trial that he was very concerned

---

[12] Appellant testified that he received a one-year credit toward his four-year sentence and could be released on parole to begin a rehabilitation program as early as February 2009.

[13] Mother was two months' pregnant with K.W. in August 2007 and five months' pregnant in November 2007.

[14] Mother told Appellant about her pregnancy during his incarceration from July 23 through August 2, 2007.

when he learned that Mother and K.W. tested positive for methamphetamine at K.W.'s birth. However, the record is devoid of evidence of Appellant's actions to ensure K.W.'s safety in Mother's womb.[15] Moreover, Appellant testified that, in his opinion, Mother did not need drug abuse treatment. Appellant also supported Mother's custody of K.W., instructing his family not to interfere with Mother's ability or potential to regain custody of K.W.[16]

We have carefully reviewed the entire record. Looking at the evidence in the light most favorable to the finding and judgment, and assuming the trial court resolved any disputed facts in favor of its finding if it could have reasonably done so, we hold that the trial court could have reasonably formed a firm belief or conviction that Appellant's conduct endangered K.W. and that Appellant knowingly allowed K.W. to remain in an endangering environment by ignoring Mother's drug use both before and after K.W.'s birth. *See* Tex. Fam. Code Ann. § 161.001 (D), (E); *In re J.F.C.*, 96 S.W.3d at 265–66; *In re C.H.*, 89 S.W.3d at 25; *In re J.T.G.*, 121 S.W.3d at 124; *see also In re T.J.*, No. 02-

---

[15] *See In re M.J.M.L.*, 31 S.W.3d 347, 351–52 (Tex. App.—San Antonio 2000, pet. denied) (finding sufficient evidence of endangerment where the father knew the pregnant mother was a drug abuser but failed to make arrangements for the care of his soon-to-be-born child, choosing instead to leave the child in the care of a drug-addicted mother).

[16] The record does not indicate whether Appellant knew that CPS removed two children from Mother in October 2005 because of Mother's drug abuse, or that those children were placed with their maternal grandmother.

05-00353-CV, 2006 WL 820518 at *6 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to support trial court's findings on endangerment due to parent's criminal history and illegal drug use). Therefore, we hold the evidence is legally sufficient to support both of the trial court's endangerment findings. Likewise, giving due deference to the trial court as factfinder, we hold that the evidence is also factually sufficient to support both of the trial court's endangerment findings. We overrule Appellant's second issue.

Accordingly, because the evidence at trial was legally and factually sufficient to support the termination of Appellant's parental rights under family code sections 161.001(1)(D) and (E), we need not address Appellant's third issue—whether the trial court erred in finding Appellant constructively abandoned K.W. *See in re E.M.N.*, 221 S.W.3d at 821; *see also* Tex. R. App. P. 47.1.

### 3. Termination Is In K.W.'s Best Interest

In his fourth issue, Appellant argues that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights is in K.W.'s best interest. *See* Tex. Fam. Code Ann. § 106.001(2). While there is a strong presumption that keeping a child with a parent is in the child's best interest, the record shows the evidence is factually sufficient to

support the trial court's finding that termination of Appellant's parental rights is in K.W.'s best interest. *See id.*; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2006). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (4) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (5) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (6) and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care; a safe physical home environment; and an understanding of the child's needs and capabilities.

*Id.* § 263.307(b); *In re M.R.J.M.*, 280 S.W.3d 494, 506 (Tex. App.—Fort Worth 2009, no pet.).

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (1) the desires of

21

the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases while other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

K.W. was almost eleven months old at the time of the termination hearing and has never lived with Appellant. Appellant stated he was not sure when he might be able to provide K.W. with a safe and stable home, but said he believed he could do so nine months after he is released from his four-year jail

22

sentence.[17] Appellant testified that he could be paroled as early as February 2009. Appellant agreed that this timeframe would be contingent on him not violating the law, the conditions of his parole, or the terms of his 10-year deferred adjudication probation for possession with intent to distribute methamphetamine.

Regarding Appellant's parenting abilities and willingness to seek out, accept, and complete counseling services to assist him in promoting K.W.'s best interest, Appellant admitted he did not sufficiently complete his service plan during the four months before he returned to jail and said that he "just didn't have time to, or transportation or finances, for any of that." Additionally, CPS had no address for Appellant and none of the phone numbers provided by Mother and Appellant worked. Indeed, Appellant had no contact with CPS between the May 7 status hearing and July 3, 2008, and again between July 10, 2008, and November 2008, after Appellant's return to jail. Appellant explained the lack of contact with CPS resulted because it "seem[ed] like I was getting the runaround from whomever answered the phone there at the [CPS] office when I would call . . . and then I got—I had stuff in storage and I was

---

[17] Upon release from jail, Appellant must enroll in a rehabilitation center for six months and then transition to an outpatient program for another three months.

23

just caught up in trying to get prepared to go back into custody for this four years."

CPS set weekly visits with K.W. for Appellant. According to CPS records, Appellant visited K.W. two times, on May 6 and July 3, 2008, and did not visit at all during the month of August. In contrast, Appellant testified he visited K.W. "at least six or seven" times, including two visits with K.W. before meeting the CPS caseworker for the first time on May 6, but conceded that he did not attend the "last couple of visits."[18] Appellant admitted his failure to visit K.W. suggested he placed a higher priority on caring for his property than on seeing his son:

> Q:   Did you believe that [not visiting weekly] was behavior that indicated or demonstrated your commitment to putting this child as a priority in your life?
>
> A:   I knew that I was going to have to go back into custody, and I just had the few limited things I had remaining in the world together preparing for me to come in and do this time.
>
> Q:   So it was more important for you to get your property in order rather than your son? Is that what you're saying?
>
> A:   That's not what I am saying. I'm saying that I was made aware by my lawyer that time was running out, period, and it doesn't make me look good, but I guess that's true, I guess.

---

[18] Appellant also testified he attended "between seven and ten" visits with K.W.

Appellant contends that K.W.'s best interests could be met by placing K.W. with Appellant's sister, and that his sister was willing and able to assume parental duties during Appellant's absence.[19]  Reasonable efforts should be made with respect to a child to be placed in foster care to preserve and reunify families and to give preference to an adult relative over a non-related caregiver in determining the placement of a child.  *In re C.C.*, No. 02-04-00206-CV, 2005 WL 1244672, at *6 (Tex. App.—Fort Worth May 26, 2005, no pet.) (mem. op.) (citing 42 U.S.C.A. § 671(a)(15)(B), § 671(a)(19) (2003)).  However, Appellant provides no authority to suggest that there is either a statutory or a common-law duty imposed on the Department to make such a placement or to investigate such a placement before a party's parental rights may be terminated.  The determination of where the child will be placed is a factor in evaluating the child's best interest, but it is not a bar to termination that placement will be with non-relatives.  *Id.* at *7; *Rogers v. Dep't of Family and Protective Servs*, 175 S.W.3d 370, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.).

---

[19] During the hearing, a Department caseworker testified that, upon termination of Appellant's parental rights, CPS planned to consider Appellant's sister as a placement for K.W. or, alternatively, for K.W. to be adopted by the current foster parents.

In considering the placement of K.W. as a factor to determine his best interest, the evidence demonstrated that Appellant's sister wanted K.W. placed with her shortly after his birth, but knew at the time that her live-in boyfriend's criminal history—a child endangerment charge involving driving and drugs—would disqualify her from being a candidate for placement. Appellant's sister testified that she and her boyfriend broke up in August 2008, and that she and their two-year-old daughter temporarily moved in with her parents until one week prior to the termination hearing—when she rented her own apartment and notified CPS she would like to be reconsidered for placement. Appellant's sister testified that her former boyfriend continues to visit their daughter once or twice a week for a couple of hours each time.[20] Accordingly, the trial court could have formed a firm conviction or belief that Appellant and his family were unwilling to effect positive personal changes within a reasonable period of time, were unable to demonstrate adequate parenting abilities, and were unable to provide K.W. with a stable home environment. *See* Tex. Fam. Code Ann. § 263.307(a); *Holley*, 544 S.W.2d at 371–72; *In re M.R.J.M.*, 280 S.W.3d at 506; *Rogers*, 175 S.W.3d at 379, *In re C.C.*, 2005 WL 1244672 at *6.

---

[20] Appellant's sister testified that, if awarded custody of K.W., she would follow a court order prohibiting any contact between K.W. and her former boyfriend.

26

The record also reveals that from October 2008 through the January 26, 2009 hearing, Appellant's sister and Appellant's mother regularly visited K.W.—approximately three or four times per month. Appellant's sister testified she believes K.W. has bonded with her during the weekly visits over the last four months. However, a CPS caseworker testified that while K.W. "appears to enjoy the visits" she did not "know that he's necessarily bonded to the relatives." K.W's foster mother testified that she believed K.W. is bonded with his foster family, that his foster family wishes to adopt him, and that, "[K.W.] is awesome . . . . we love [K.W.] more than anything in this world, and there is nothing that we wouldn't do for [K.W.]." Thus, in giving due deference to the trial court as factfinder, the trial court could have found that termination of Appellant's parental rights was in K.W.'s best interest based in part on the stability and strength of the relationship between K.W. and his foster family.

Regarding K.W.'s physical needs, he was recently diagnosed with asthma, must be given breathing treatments twice a day, and is "very susceptible to smoke." No one in K.W.'s foster home smokes.[21] Appellant's sister testified that when she goes to work, her two-year-old daughter is

---

[21] To help K.W.'s breathing, the foster family found other homes for their three dogs, replaced the carpet in their home, purchased humidifiers, moved K.W. to a private daycare with fewer children, and required the lone family member who smokes to "put something on over her clothes and [told] her not to smoke prior to coming over to visit."

watched by her mother, who lives less than a mile away. Appellant's sister testified that her mother smokes half a pack of cigarettes per day, but steps outside to smoke when she is watching the child. If K.W. were placed with Appellant's sister, her mother would watch K.W. and her daughter at Appellant's sister's apartment. If granted custody of K.W., Appellant's sister testified that she would want Appellant involved in K.W.'s life as long as Appellant was drug-free. Based on this record evidence, the trial court could have formed a firm conviction or belief that terminating Appellant's parental rights was in K.W.'s best interest due to K.W.'s physical needs and the inability of Appellant's family to effect positive environmental changes. *See* Tex. Fam. Code Ann. § 263.307(a); *Holley*, 544 S.W.2d at 371–72; *In re M.R.J.M.*, 280 S.W.3d at 506.

Giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold the trial court could have reasonably formed a firm belief or conviction that termination of Appellant's parental rights would be in K.W.'s best interest. *See In re C.H.*, 89 S.W.3d at 28; *see also In re K.W.*, No. 02-07-00458-CV, 2008 WL 2639037, at *4 (Tex. App.—Fort Worth July 3, 2008, no pet.) (mem. op.) (holding that clear and convincing evidence existed that termination of father's parental rights was in child's best interest where, among

28

other factors, father had a pattern of criminal conduct and drug abuse). Accordingly, we hold that the evidence to support the trial court's best interest finding was factually sufficient, and we overrule Appellant's fourth issue.

## IV. Conclusion

Having overruled Appellant's dispositive issues,[22] we affirm the trial court's judgment terminating his parental rights to K.W.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, GARDNER and MCCOY, JJ.

DELIVERED:  January 14, 2010

---

[22] ... *See* Tex. R. App. P. 47.1.

29